NIELS PEARSON
Nevada State Bar No. 1061
3050 S. Durango Drive
Las Vegas, NV 89117
Telephone:    (702) 872-5555
Facsimile:    (702) 872-5545

MARIANNE C. LANUTI
Nevada Bar No: 007784
194 Inveraray Crt.
Henderson, Nevada 89074

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JANE ROE, individually, and the natural mother and Guardian on behalf of PRESCHOOLER II, a minor child, <br><br> Plaintiffs, <br><br> vs. <br><br> CLARK COUNTY SCHOOL BOARD OF TRUSTEES; CLARK COUNTY SCHOOL DISTRICT, CARLOS ARTURO GARCIA, in his individual and official capacity; CHARLENE A. GREEN, in her individual and official capacity; MICHAEL S. HARLEY, in his individual and official capacity; KAY DAVIS, in her individual and official capacity; DARRYL WYATT, in his individual and official capacity; KATHLEEN LISANTI, in her individual and official capacity ; and DOES 1 to 10 inclusive, <br><br> Defendants. | Case No.      **2:04-CV-0348-RLH-PAL** |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MSJ AS TO PLAINTIFFS' SECOND AND THIRD CLAIMS FOR RELIEF

1

Comes now, Plaintiffs, by and through their attorneys of record and provide the following Points and Authorities in Opposition to Defendants' Motion for Summary Judgment as to the Plaintiffs' Second and Third Claims for Relief:

### Introduction

Defendants seek a summary judgment on all claims for compensatory damages under what is commonly referred to as the Rehabilitation Act(RA) and the Americans with Disabilities Act(ADA) solely on the grounds that Plaintiffs cannot prove "discriminatory intent" and more specifically, under the prevailing Ninth Circuit definition of "deliberate indifference" .

The sole thrust of their Motion is Plaintiffs have no triable evidence of "deliberate indifference" which "requires both knowledge that a harm to a federally protected right was substantially likely, and a failure to act on that likelihood" Roe *ex. rel. Preschooler II v. Nevada* 332 F. Supp 2d 1331, 134 (2004) (citing *Duval v. County of Kitsap* 260 F.3d 1124(9th Cir. 2001)

Defendants erroneously claim that "deliberate indifference under the RA and ADA is proven by "failure to train". As set forth in the controlling precedent in the Ninth Circuit, *Duval v. Kitsap, supra., municipal* liability "failure to train" under 42 USC 1983 have no applicability to RA and ADA damage claims.

As set forth below, and documented in the Omnibus Material Facts Statement LR-56-1 there is ample, triable proof of actual discriminatory intent meeting the Ninth Circuit meeting the two part "deliberate indifference" test. As concluded by this court in denial of an earlier Motion to Dismiss, the RA and ADA causes of action against the District and the Board are triable to a jury upon proof the District and Board "had notice of the alleged abuse of Preschooler and failed to act." *Roe v. State* 332 F. Supp 2d 1331, 1341 (2004)

**I.  The Standard for Review of Issues of Deliberate Indifference under the RA and ADA**

*Federal Rule of Civil Procedure 56(c)* mandates entry of summary judgment if the

pleadings and supporting documents, when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact...." *See Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1420 (9th Cir.1990); *Palmer v. United States,* 794 F.2d 534, 536 (9th Cir.1986). In order to successfully rebut a motion for summary judgment, the plaintiffs must point to facts supported by the record which demonstrate a genuine issue  of material fact. *Reese v. Jefferson School Dist. No. 14J,* 208 F.3d 736 (9th Cir.2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Id.* A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang,* 711 F.2d 141 (9th Cir.1983).

In determining whether liability exists for deliberate indifference, the Ninth Circuit's has a history of leaving the question of deliberate indifference to the jury. *See Oviatt By and Through Waugh v. Pearce,* 954 F.2d 1470, 1478 (9th Cir.1992) ("Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury.") (citing *Davis v. Mason County,* 927 F.2d 1473, 1482 (9th Cir.1991)). *See also Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1367 (9th Cir.1994); *Blair v. City of Pomona,* 206 F.3d 938, 2000 WL 290246, *5 (9th Cir.2000); *Lee v. City of Los Angeles,* 250 F.3d 668, 681 (9th Cir.2001); and *Perrin v. Gentner,* 177 F.Supp.2d 1115, 1124 (D.Nev.2001).

## II. The District and Board have Respondeat Superior Liability under Damage Claims for the RA and ADA

The same case establishing the definition of "deliberate indifference" for compensatory damages under the RA and ADA also establishes that the District and Board have *respondeat superior* liability for actionable claims of their employees. As stated in *Duval v. County of Kitsap, supra.* 260 F. 3d at 1141:

> When a plaintiff brings a direct suit under either the Rehabilitation Act or Title II of the ADA against a municipality (including a county), the public entity is liable for the vicarious acts of its employees.  We have held that, under § 504 of the Rehabilitation Act (upon which the ADA was explicitly modeled), we apply the doctrine of *respondeat superior* to claims brought directly under the statute, in part because the historical justification for exempting municipalities from *respondeat superior* liability does not apply to the Rehabilitation Act, and in part because the doctrine "would be entirely consistent with the policy of that statute, which is to eliminate discrimination against the handicapped." (citing *Bonner,* 857 F.2d at 566-567).   These same considerations apply to Title II of the ADA. *See Zukle,* 166 F.3d at 1045 n. 11 (holding

3

1   that, under <u>42 U.S.C. 12133</u>, the "remedies, procedures, and rights" available under

2   Title II of the ADA are equivalent to those available under § 504).   The County is

    therefore vicariously liable for the actions of the two County employees, Razey and

3   Richardson.

4        Thus, as set forth below, the issues of  "intentional discrimination through "deliberate

5   indifference" are provable through the acts or omissions of its employees—most notably Principal

6   Darryl Wyatt, but also other CCSD employees-- whether  individual Defendants in the present suit

7   or not[1]—whose acts or omissions constitute "knowledge that harm to a federally protected right is

    likely and failure to act on that likelihood" *Id.* at 1139

8        While the right to handicap accommodations for the Plaintiff to effectively participate and

9   understand court proceeding  in *Duval*  was an "obvious" federal right for accommodation under

10  the ADA and non-discrimination under the RA, in the present case, it is equally obvious that

11  Preschooler II  is federally protected by the laws and regulations  to be free from mental and

12  physical abuse.

13  A.   <u>There is a "federally protected right" under the RA  and ADA for a disabled child, such as</u>

    <u>Preschooler II, to  be free from physical or mental abuse</u>

14
    In *Roe ex. rel. Preschooler II v. Nevada, supra.* at____, this court stated:
15          "Plaintiffs repeatedly allege, in various ways, that Preschooler II
            was abused at school by his teacher and that this abuse deprived him
16          of his education. Plaintiffs also allege that this abuse happened
            because Preschooler II was an autistic child and participating in a
17          special education preschool."

18       Section 504 provides that no otherwise qualified individual with a disability shall, "solely

19  by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be

20  subjected to discrimination under any program or activity receiving Federal financial assistance".

21  29 USC 794(1994).   Public schools and state educational agencies receive federal financial

22  assistance, so the law covers them. Students receive the protection of the law if they meet a

23  disability standard of having a physical or mental impairment that substantially limits one or more

    of the person's major life activities, have a record of such an impairment, or are regarded as having

24  such an impairment. Regulations promulgated under section 504 further define the discrimination

25  prohibited by the Act, barring conduct that denies a person with a disability the opportunity to

26  benefit from services that are not equal to those provided others, and that are not as effective as

27  ─────────────────
    [1] As set forth in the factual recitation , *infra.*, Jackie Green and Jeff Atkinson of the "low
28  incidence" team charged with instructional support the LiSanti KIDS classroom were notified by

those provided to others. 34 C.F.R. § 104.4(b) (2001)

Disability harassment through verbal and physical abuse constitutes discrimination that violates section 504 and its regulations. Being subjected to physical and mental abuse  at the hands of school personnel  makes the public school experience decidedly unequal to the experience of others. Harassment excludes students with disabilities from the educational environment provided to students without disabilities and discourages students with disabilities from continuing their education beyond the minimum period required by law.

The Title II regulations include a provision specifically prohibiting retaliation and coercion,[2] as do the ADA's general provisions, embodied in title V.  By barring conduct that interferes with, threatens, or intimidates individuals exercising their rights to participate in public programs, these provisions furnish an additional basis for prohibiting harassment. Physical or verbal abuse  of children with disabilities a "federally protected right"  because these abuses take place  on public school grounds and are conduct that intimidates and interferes with disabled children  who have  rights to participate in a public educational program.

Finally, as this court noted in *Roe ex. rel. Preschooler II v. Nevada, supra.*

> "Additionally, Plaintiffs allege that because Defendants know of the alleged abuse yet failed to inform Preschooler's parents, Plaintiff Roe was deprived of participation in the IEP process"

Jill Greiner, the State  Review Officer  concluded that the parents were deprived of a significant right to participate in the formulation of Preschooler II's IEP, making the following findings:

> "Third, it was established at the hearing that teacher (LiSanti) used two interventions with student: 1) required him to walk from the bus to the classroom across asphalt with no shoes which teacher described as an attempt to ignore and not reinforce the behavior of removing his shoes and socks; and 2) using a handover technique

---

Patricia Been of abuses by LiSanti in the fall of 2002.

[2] 28 C.F.R. § 35.134(b) (2001) ("No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed ... any right granted or protected by the Act or this part."). Regulations applicable to section 504 impose a similar duty. 34 C.F.R. § 104.6 (2001) (incorporating by reference antiretaliation provision of 34 C.F.R. § 100.7(e) ("No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by ... the Act or this part ....")).

42 U.S.C. § 12203(b) (1994) ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised ... any right granted or protected by this chapter.").

causing student to slap himself as an intervention of 'over-correction' to eliminate the slapping behavior.   Parents were unaware these techniques were being used.   Had CCSD followed the requirements of NAC, parents would have been informed and involved in the decision-making regarding appropriate behavior interventions for student." (SRO Decision p.   ).

The State Review Officer Decision concluded:

"In March of 2003, several incidents of suspected child abuse were reported and investigated including incidents regarding student. Subsequent to the final IEP at issue (after April 2, 2003), and quite some time after student was subjected to over-correction and walking on asphalt without shoes, parents were informed by the principal that teacher was under investigation for having used inappropriate interventions with students.  Again, parents requested a change of placement, which this time was granted.  Again, parents were not informed that they had a right to participate in the development of methods that would be employed with students in his IEP." (Appellant ROA 140).

Whether viewed as a *per se* violation of the ADA and RA to be free from verbal abuse or a federally protected right under the IDEA, it is obvious that Preschooler II had a federally protected right not be physically and mentally abused and his parents, Jane Roe, in particular, had a right to know of the abuse.

In *Witte v. Clark County School District* 197 F.3d 1271, 1272(9th Cir. 1999)  the Nevada case concerning  force-feeding and other physical and psychological abuse, the court overturned a dismissal of claims under Rehabilitation Act section 504 and title II of the ADA.   Although most of its discussion centered on exhaustion, the court effectively approved a cause of action for disability harassment under the two statutes.

B.    Knowledge of Abuse

Defendants disingenuously state: "Plaintiffs cannot produce evidence of knowledge of any allegations of abuse that were not acted upon by Defendants" Defendants Motion 9:8-10.

Here is the evidence as more fully documented in the Omnibus Statement of Material Facts LR 56-1:

- On September 27, 2002, Richard and Gina Seideman visited the KIDS classroom to bring toys for the children, since there were few toys and materials in the classroom.   The Seidemans both observed aide, Peggy Cravish manhandle and physically and mentally

6

abuse Preschooler I.  Both witnessed Cravish jerk  Preschooler I  bodily off the floor by one arm and toss him 2 to 3 feet to a nearby mat.  Cravish then dragged Preschooler I, crying and screaming, to the bathroom stating it was for a "time out".  Richard Seideman testified the light was out after Cravish entered the bathroom, where both remained for two to five minutes. SMF Exhibit 8  Deposition of Richard Seideman 19:12-30:1

Both Seidemans not only felt the whole incident abusive, but their daughter, a classmate, was severely traumatized not only by the incident, but she also had unexplained bruises and was terrified to get on the bus to go to school, a dramatic behavioral reversal from her previous schooling.

The Seidemans reported the incident to Principal Wyatt in three separate letters; Gina Seideman met with Wyatt; and talked to the State Department of Education in Reno; attempted to report the incident to Child Protective Services;  and sent notice of the incident to Clark County School District Superintendent Carlos  Garcia. Plaintiffs' Statement of Material Facts (SMF 17), SMF Exhibit 9 Dep. Gina Seideman 32:24-36:19; Dep. Richard Seideman  SMF Exhibit 8 22:5-26:4

In a  meeting with Principal Wyatt, it was discussed that the actions of Cravish were inappropriate and Wyatt identified that the child involved was Preschooler I, previously misidentified in correspondence by the Seidemans.  Dep. Gina Seideman 39:13-41:19

Gina Seideman requested  Wyatt report the incident to the parents of Preschooler I (*Id.* 63:1-17).[3]

- Early in the school year,  some time on or before November  2002, class aide, Kathy DeSario reported to the principal, Daryl Wyatt,  verbal abuse and the slapping of Preschooler II by Li Santi using Preschooler II's own hands:

> "[Preschooler II] is the one that—she would get him to slap himself.  She'd get his hands and make him, you know, slap himself  like I was showing you before. And I believe that's what I reported at the time . And I probably added the other little incident in there.  ...About the verbal abuse."
> (SMF 20) Deposition Kathy DeSario, Oct 17, 2004(afternoon session) 30:25-31:7; 33:7-35:11. (SMF Exhibit 2.)

---

[3]  This notification is relevant, even though it involves Peggy Cravish and Preschooler I, because Stuart Limbert, a substitute teacher testified in late 2005 that Cravish similarly manhandled Preschooler II. (SMF 14) SMF Exhibit 5, Depo. Stuart Limbert 16:16-30:18

- DeSario testified Dr. Wyatt "did not seem concerned" and merely stated to report anything else. (SMF 20) *Id.*

- In November or December 2002, Patricia Been, a part-time teacher in the LiSanti KIDS classroom reported to her supervisor, Maureen Powers, and the CCSD "low incidence" team that had responsibility for the classroom, Jackie Green and Jeff Atkinson, that LiSanti was "rough", "screaming and posturing" and roughly grabbing the preschoolers and seating them in chairs as a "timeout". (SMF 22) Exhibit 1 Testimony of Patricia Been, Transcript of Hearing 662:8-663:20

- In January or February 2003, one or two days after the first of three incidents of having Preschooler II being forced to walk across the playground barefoot, Kathy DiSario reported the incident to Principal Wyatt who said he was "concerned" but didn't know if it was "reportable" and later told DiSario "She's [LiSanti] from the old school and uses old ways to discipline the children"(SMF 23) Exhibit 2 , Deposition of Kathy DeSario 52:2-54:23

In summary, there is ample evidence of notice to the District and Board that Preschooler II was being physically and mentally abused months before he was removed from the Betsy Rhodes KIDS classroom.

Under *respondeat superior* and parallel case law involving Title IX sexual abuse cases by teachers molesting students, notice to the site administrator, or principal of intentional discrimination is notice to the School District and Board.

In *Murrel v. School District No. 1* 186 F. 3d 1238 (10th Cir. 1999) a Title IX sexual harassment case against the District, the court found the much more stringent test of "actual notice" of the District were the Principal of the school had the power to control and prevent the sexual abuse by another student:

> We find little room for doubt that the highest-ranking administrator at GWHS exercised substantial control of Mr. Doe and the GWHS school environment during school hours, and so her knowledge may be charged to the School District. *See Davis,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (finding a basis for Title IX liability when principal allegedly had actual knowledge of sexual harassment and failed to respond to ameliorate the situation).[FN4] The Denver Public Schools' sexual harassment policy, which prohibits **\*1248** peer sexual harassment, provides that " grievances would routinely be filed" with the principal. Aplt.App. at 117-18. Principal Johnston had the authority to suspend students " for ' [b]ehavior which is detrimental to the welfare, safety, or morals of other pupils,' " *Id.* at 14; indeed, she allegedly enforced this policy against Ms.

8

Jones, although not against Mr. Doe. According to the complaint, the principal and teachers "never appropriately disciplined Doe," *Id.*, and he continued to enjoy access to unsupervised parts of the GWHS facility. Principal Johnston's alleged " response to the harassment or lack thereof [wa]s clearly unreasonable in light of the known circumstances." *Davis,* 526 U.S. at ----, 119 S.Ct. at 1674. Her complete refusal to investigate known claims of the nature advanced by Ms. Murrell, if true, amounts to deliberate indifference. As Ms. Murrell has adequately alleged actual knowledge and deliberate indifference on the part of Principal Johnston, she has satisfied the first two elements of the *Davis* inquiry.

FN4. We also note that in *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), a teacher-student harassment case, no school official above the principal had notice of the alleged sexual harassment. *See Franklin v. Gwinnett County Pub. Sch.,* 911 F.2d 617, 618 (11th Cir.1990), *rev'd,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (noting that the band director, assistant principal, and later principal knew of the inappropriate conduct).... *Id.* at 1247-8

While a different and more liberal rule of "deliberate indifference" applies to the RA and ADA, the evidence in this case of *respondeat superior* liability (and notice) for the deliberate indifference of Darryl Wyatt is strikingly similar.

Quoting from the Omnibus Statement of Material Facts LR 56-1:

- Wyatt acknowledged he had a duty to report[Cravish jerking Preschooler I off the floor and placing him in "time out" in the bathroom] if the incident as alleged occurred[4], but he did not report it and did not notify the parents because he believes there was no incident. *Id.*[5]

- Wyatt never suspended, nor did he formally or informally discipline Kathleen LiSanti, merely sending her home, with pay, and allowing her to transfer to another school. Nor

---

[4] CCSD police officer James Baron testified the parents of alleged victim of child abuse should have been notified and interviewed, as well as the Seidemans but that did not occur and the complaint was closed without a reportable victim. SMF Exhibit 15, Deposition of James Baron 17:19-27:7

[5] Garcia, also after reviewing the CCSD Police Report involving the September 27, 2002 incident (Exhibit 14, CCSD 02806-14)and testified the mere allegations, whether true or not, should have resulted in a reported aversive intervention within 24 hours. SMF Exhibit11, Deposition of Carlos Garcia 32:13-18  Moreover, the parents not only should have been notified, but interviewed. *Id.* at 42:16-44:12.

did she attend a training session at the School for reporting aversive interventions.[6](*Id.* at
51:4-52: 23;  55:1-56:18)

- Ms Davis confirmed the custom and policy that the site administrator, Darryl Wyatt, was
charged with the ultimate responsibility for the KIDS program at Betsy Rhodes. *Id.* at 13:9-
15:12.

- Associate Superintendent Charleen Green testified  only the principal is in charge of
disciplining any teacher, aide or other general CCSD employee abusing special education
child and she and her department have *no role whatsoever*. *Id.* at 19:3-8.  Moreover,
Compliance and Monitoring has no mechanism to make sure that an employee guilty of
child abuse is actually disciplined. *Id.* at 20:6-11.

- Ms. Green states that Compliance and Monitoring has no jurisdiction over  discipline,
even if they learn a site administrator or principal has failed to discipline a child abuser
employee *Id.* at 20:12-22

- Associate Superintendent Charleen Green testified  only the principal is in charge of
disciplining any teacher, aide or other general CCSD employee abusing special education
child and she and her department have *no role whatsoever*. *Id.* at 19:3-8.  Moreover,
Compliance and Monitoring has no mechanism to make sure that an employee guilty of
child abuse is actually disciplined. *Id.* at 20:6-11.

- Ms. Green states that Compliance and Monitoring has no jurisdiction over  discipline,
even if they learn a site administrator or principal has failed to discipline a child abuser
employee *Id.* at 20:12-22

---

[6] Superintendent Garcia testifies that if there is found to be an aversive intervention, some
disciplinary action, up to dismissal is to take place. Deposition, Carlos Garcia, SMF Exhibit11,
33:17-24.  Some form of discipline must take place if there is a Aversive Intervention Report and
CAP filed with the State *Id.* at 56:8-23

10

- Harley admits that, given the fact a CAP was prepared for the LiSanti hair pulling incident, an Aversive Intervention Report should have been prepared. *Id.* 130:7-17

- Harley claimed it is for principal Wyatt to answer why no Aversive Intervention Report was prepared. *Id.*

- Darryl Wyatt readily acknowledged when he hired Kathleen LiSanti he had no training in special education or autism.  His training, in the first year of the KIDS program at Betsy Rhodes consisted of  a one day seminar by Ron Leaf. Deposition  Darryl Wyatt, (SMF  42) Exhibit7,70:19-75:4

In summary the site administrator, Darryl Wyatt had total control over the hiring and discipline of teacher LiSanti and aide Cravish.  No one in Compliance and Monitoring had the power or jurisdiction to even recommend discipline, even though the Aversive Intervention Law NRS 388.__ requires discipline for aversive interventions and Superintendent Carlos Garcia testified this was the policy of the District.[7]

C.      Deliberate Failure to Act

The final prong of the "deliberate indifference" test under *Duval* is "the failure to act is more than negligent and involves an element of deliberateness" 260 F. 3d at 1139.

Wyatt, in conjunction with Harley engaged in what can only be described as a "cover-up" to prevent disclosure, reporting , discipline and remediation of serial abuse by LiSanti.

Wyatt had control over who and what was reported as far as allegations of abuse of Preschoolers and others by LiSanti and Cravish.

**The Cravish Incident of Jerking and Time Out on September 27, 2002**

---

[7] Superintendent Garcia concluded that if there is found to be an aversive intervention, some disciplinary action, up to dismissal is to take place. Deposition, Carlos Garcia, SMF Exhibit 11, 33:17-24.  Some form of discipline must take place if there is a Aversive Intervention Report and CAP filed with the State *Id.* at 56:8-23

- Principal Wyatt commenced in late September 2002 a systematic cover-up of abuses in the Rhodes KIDS classroom with the report of Peggy Cravish jerking a student by one arm off the floor and putting him in "time out" in the bathroom.

- Wyatt concluded the incident never occurred, but never interviewed Peggy Cravish, because she was "not in the room at the time" and was transferred to another school.[8] (SMF 25) SMF Exhibit 7, Depo. Daryll Wyatt 103:9-105:4

- Wyatt also concluded by talking to other teachers in the classroom, including Kathy DeSario and Stuart Limbert[9], that the incident did not occur. (SMF 26) *Id.* at 96:10-112:14

- Wyatt believed the student involved was Preschooler II, not Preschooler I. (SMF 27) *Id.*

- Wyatt believed the Seidemans never witnessed the abuse incident reported.(SMF 28) *Id.*

- Wyatt denied receiving the letter addressed to him identifying the victim of the abuse as Preschooler I.(SMF 29) *Id.*, Exhibit13, Letter to Wyatt from Seidemans Admin. Rec. 001241.

- Wyatt acknowledged he had a duty to report if the incident as alleged occurred[10], but he did not report it and did not notify the parents because he believes there was no incident.(SMF 30) *Id.*[11]

---

[8] CCSD Superintendent Carlos Garcia who was notified of the incident by a letter from the Seideman's (See, *infra.* III. C.1) testified that any teacher or aide accused of aversive intervention or child abuse "absolutely" should be questioned, even if transferred to another school, as a matter of CCSD policy and procedure. SMF Exhibit11, Deposition Carlos Garcia 40:3-42:15

[9] ) Stuart Limbert, the substitute teacher, present on the 27th of September, testifies Peggy Cravish "jerked" *both* Preschooler I and II off the floor with angry grimace on his face. Because Limbert had no training in special education (he is a P.E. teacher) he did not know what was or was not reportable, only that Peggy Cravish's jerking the two autistic four year olds by one arm off the floor seemed abusive and in retrospect should have been reported. Limbert states no one interviewed him about abuse in the KIDS classroom, including Principal Wyatt or the CCSD police. SMF Exhibit 5, Depo. Stuart Limbert 16:16-30:18

[10] CCSD police officer James Baron testified the parents of alleged victim of child abuse should have been notified and interviewed, as well as the Seidemans but that did not occur and the complaint was closed without a reportable victim. SMF Exhibit 15, Deposition of James Baron 17:19-27:7

[11] Garcia, also after reviewing the CCSD Police Report involving the September 27, 2002 incident (Exhibit 14, CCSD 02806-14)and testified the mere allegations, whether true or not, should have

**Failure to Investigate or report LiSanti abuse in November 2002**

- Wyatt stated no one complained about LiSanti in the beginning of the school year.[12] *Id.* at 96:24-97:25

- Wyatt denies that he knew, in January and February[13], of the forced walk barefoot across the pavement, claiming he first heard about one, not three incidents, in April 2003, completing an Aversive Intervention report on April 15, 2003, after LiSanti and the Preschooler II had left Betsy Rhodes ES. *Id.* at 64:1-70:1, AB 280 Report, SMF Exhibit 16

**Under-reporting, non-reporting and failure to file claims of abuse revealed by the CCSD police department investigation in April 2003**

- In early April 2003, when confronted with additional claims of abuse by LiSanti and Been involving slapping of Preschooler I and II by LiSanti, Wyatt prepared and signed only two Aversive Intervention Reports involving only the slapping of Preschooler I witnessed by Been and a report involving one barefoot pavement walking incident involving Preschooler II. *Id.* at 145:1-9

- Wyatt, while notifying Preschooler II's parents of the circle time slapping incident, acknowledges that he did not file an Aversive Intervention Report on that claim of abuse. *Id.* at 139:16-22

- However, both reports, while checking the boxes of Parent Notification, SMF Exhibit 17 CCSD 00030 and Exhibit 16 CCSD 280 3705, respectively) were not copied to the parents of Preschooler I or II or sent the IEP teams of either Preschooler. with Wyatt claiming he did not know the reports should have been sent to the IEP teams, and thought that the Been Slapping should have been sent by Been/Powers. [14] *Id.* at 128:18-130:15

---

resulted in a reported aversive intervention within 24 hours. SMF Exhibit 11, Deposition of Carlos Garcia 32:13-18 Moreover, the parents not only should have been notified, but interviewed. *Id.* at 42:16-44:12.

[12] Kathy DiSario, as noted above, testified that early in the school year, she reported to Principal Wyatt that Kathleen Li Santi was mentally and physically abusing both Preschooler I and Preschooler II. Deposition Kathy DeSario, SMF Exhibit 2 30:25-31:7; 33:7-35:11.

[13] Kathy DiSario, as noted above, swears she reported the first incident one or two days after it occurred in January or February of 2003. SMF Exhibit 2 ,52:2-54:23

[14] At due process hearing involving Preschooler I, Wyatt testified that there were no Aversive Intervention Reports. Transcript of Hearing Preschooler I. Wyatt believes at the time of the hearings, several months had passed and he was "sketchy" on the facts Deposition, SMF Exhibit 7, 127:21-128:17

13

- Despite the Parent Notification box checked as to Preschooler II's parents, Wyatt admitted he neither sent Aversive Intervention  Report nor did he communicate with either parent involving the barefoot pavement  walking claim. merely stating he "doesn't know why" he did not disclose this claim of  aversive intervention to the parent.[15] Id at 59:25-61:19

**Wyatt failed to question the conduct, let alone, discipline LiSanti and Cravish**

- In deposition, Wyatt testified, in his opinion there was no abuse or even aversive interventions by Kathleen LiSanti,  including the circle time slapping incident involving Preschooler II (*Id.* at 30:24-32:22 ) the Been slapping incident involving Preschooler I(*Id.*), the  barefoot  pavement incident(Id at 59:25-61:19)  , and a hair pulling incident involving a third child (*Id.* at 131:20-135:9)

- Wyatt never suspended, nor did he  formally or informally discipline Kathleen LiSanti, merely  sending her home, with pay, and  allowing her to transfer to another school.  Nor did she attend a training session at the School for reporting aversive interventions.[16](*Id.* at 51:4-52: 23;  55:1-56:18)

**Commencing in April 2003, through the discovery and litigation Michael Harley and Compliance and Monitoring have suppressed full disclosure of the serial abuses**

- Harley acknowledges receipt of the April 3, 2003 e-mail authored by Maureen Powers alleging multiple abuses  "…occurring with three children all year long and it has been reported to the principal with no action taken"  SMF Exhibit 22 CCSD 33, *Id.* at 142:13-145:2

- Harley does not recall his discussions with Wyatt, other than the "Seideman's concerns" or what other children and incidents were involved. *Id.* at 143:10-145:2

- If Aversive Intervention Reports for these other abuses were not prepared and filed, in his opinion was merely a "technical violation of the statute"  and the parent's recourse was to file request for investigation by the State Department of Education[17]. *Id.* 145:3-146:1

---

[15] Only after a Motion to Compel all Aversive Intervention Reports did this Report, SMF Exhibit 16, CCSD280 3705. See, discussion of the sworn testimony of Michael Harley, *infra.* Concerning the administrative rejection of this report by Green/Harley Compliance and Monitoring department
[16] Superintendent Garcia testifies that if there is found to be an aversive intervention, some disciplinary action, up to dismissal is to take place. Deposition, Carlos Garcia, SMF Exhibit11, 33:17-24.  Some form of discipline must take place if there is a Aversive Intervention Report and CAP filed with the State *Id.* at 56:8-23
[17] Harley has proposed a "Catch-22" as if the parents are not notified of abuses  by the school district and their child is unable to verbalize the abuse, the failure to report has resulted in no

- It is Harley who was in charge of the Due Process Hearing defense, and admits he had personal knowledge of this   investigation (*Id.* at 65:5-71:5) and     the two Aversive Intervention Reports were filed with his office on April 7th and April 15th (Exhibit 17, CCSD 00029-32; SMF Exhibit 16, CCSD280 3705), yet at the Due Process hearing, the reports were not produced.[18]

- When the litigation was filed in federal court, the one Aversive Intervention Report was provided (SMF Exhibit 17, CCSD 00029-32, but not the other directly involving Preschooler II.  In fact, Harley admits he reviewed this latter report when this litigation was filed *and still the report was never produced. Id.* at 66:4-21

- At the due process hearing level, Harley fought to prevent the disclosure of the CCSD Police Report, which contains damning eyewitness testimony unknown at the time witness testimony was taken. (SMF 110-113)   His office, apparently rejected the Aversive Intervention Report involving Preschooler II being required to walk barefoot across the playground, illogically and narrowly claiming "not a restraint" *Id.* at 85:14-93:18

- Harley opines,  if the act of having Preschooler II walk barefooted across the pavement was for purposes to punish then he would consider it an aversive intervention *Id.* at 103:12-104:13

- Such aversive interventions must be reported by site administrators of a school, even when the report if an eyewitness report is contradicted. *Id.* at 42:15-43:14

- Harley, when shown a copy of the Aversive Intervention Report prepared by Principal Wyatt in April involving  Preschooler II in one of the three barefoot pavement incident admitted this report should have been disclosed to the parents, IEP team and placed in Preschooler II's file *Id.* at 53:15-54:14

- Despite the fact that this report (SMF Exhibit 16, CCSD280 3705) was prepared April 15, 2003,  received by his office that same date, was the subject of a due process hearing in which Harley participated, was extremely relevant to the current lawsuit, claiming non-reporting and violations of the Aversive Intervention Law, and yet, *never disclosed* until compelled to do so and then only with a production of over 7000 similar Aversive Intervention reports with names redacted.   Harley  testified  the  non-disclosure  is  a

---

remedy and institutional cover-up

[18] Wyatt, at the hearing of Preschooler I, stated the Aversive Incident Reports did not exist. *See,* footnote 13, *supra.*

15

"technical violation of the statute" and was not indicative of a "pattern and practice not to report" *Id.* at 53:6-54:19.

- Likewise concerning the second Aversive Intervention Report involving the Been witnessed slapping incident and Preschooler I, Harley knows his office had the document because it prepared and filed a Corrective Action Plan on May 3, 2002, prior to the first Due Process Hearing in June of 2003, once again, claiming the breach of the law and separate non-production in a contested hearing was "oversight" *Id.* at 110:22

- Harley then speculated the non-production of this report was due to the principal Wyatt's determination there was no aversive intervention. *Id.* at 55:1-19, contradicting his earlier testimony that even contradicted eyewitness claims reported and disclosed.

- Harley opined force-feeding Preschooler II potato chips crushed into his yoghurt, until he choked was not an aversive intervention. *Id.* at 140:12-141:16

- Harley after reviewing the CAP plan that was prepared by his office, signed by Associate Superintendent, Charleen Green, dated April 11, 2003. SMF Exhibit 31, CCSD 00034-5, admitted that he recalls a claim of a hair pulling incident by Kathleen LiSanti, involving a third student in the Betsy Rhodes KIDS classroom. *Id.* at 123:8-124:11

- Harley admits that, given the fact a CAP was prepared for the LiSanti hair pulling incident, an Aversive Intervention Report should have been prepared. *Id.* 130:7-17

- Harley claimed it is for principal Wyatt to answer why no Aversive Intervention Report was prepared. *Id.*

- Harley admits his staff determined the hair pulling incident was use of corporal punishment with intent to inflict physical pain—findings in conjunction with interviewing staff, talking to the principal and teacher. *Id.* at 130:18-132:11

- Harley denied any deliberate false statement by his staff in the CAP for a misrepresentation to the State Department of Education "The school contacted the parent and sent a copy of the incident report home"[19] SMF Exhibit 31, CCSD 00035

- After reviewing the follow-up documentation to the State Department of Education concerning "training" by viewing the CCSD Powerpoint under the CAP for the two abuses by LiSanti that were reported to the State, (SMF Exhibit 32, CCSD 00037-38), Harley acknowledged LiSanti was not present and it didn't happen. *Id.* at 156:18-159:23.

---

[19] It is established that there is no "incident report" as to the hair pulling incident and a third student and Preschooler I's parents were never provided an "incident report."

- When pressed what was done to prevent recurring abuses by LiSanti, Harley states "I can't prevent her from doing... I would have done training." but "It didn't happen because she was not there at the time." *Id.* at 157:18-160:23
- Harley acknowledges CCSD has a "zero tolerance" policy for child abuse, criminal battery and aversive interventions.  Specifically, it is the Superintendent's policy that if staff engages in corporal punishment and physical abuse, that would result in disciplinary action of possible criminal charges.  This policy was in effect in 2002-3.  He knew the policy then *Id.* at 187:15-190:17
- Harley states he does not have the authority to instruct the site administrator to discipline staff if a child is abused or if aversive interventions are documented. *Id.*
- Harley made no disciplinary recommendations with regard to LiSanti or Cravish. *Id.*

III. Summary and Conclusions

Plaintiff has provided this court with substantial evidence of intentional discrimination defined by the Ninth Circuit test in *Duval* of "deliberate indifference" constituting notice and knowledge of harm to a federally protected right and a deliberate failure to act.

The Defendants, CCSD and CCSD Board of Trustees are vicariously liable for compensatory damages under the RA and ADA for the continued serial abuse of Preschooler after Wyatt and the Low Incidence Team had Notice. As to the former, Wyatt, there is ample and overlapping evidence that Wyatt's failure to act was deliberate when fully—and exclusively— empowered to investigate and prevent further physical and mental abuse by LiSanti directed at Preschooler II .

Moreover, Wyatt's failure to report clear reportable abuses and aversive interventions, irrationally finding the conduct excusable, and thereafter failing to discipline LiSanti (or Cravish) contrary to CCSD policy, is not only "more than negligence" and deliberate, it is egregious cover-up.

Finally, when the investigation of LiSanti, spurred by personnel outside the school itself began in April of 2003, Michael Harley and his staff in Compliance and Monitoring continued non-disclosure of required Aversive Intervention Reports, first to the parents and IEP team and then through claimed "oversight" and "technical violations" to counsel for the Plaintiffs in the Due Process Hearing and in this litigation.

The bulk of Defendants' legal claims and evidence is misdirected to the issue of municipal

liability for "failure to train" that under *Duval* and principles of *respondeat superior* liability have no application to Plaintiffs RA and ADA claims.

It is respectfully requested Defendants' Motion for Summary Judgment, based solely on claim of lack of evidence of intentional discrimination defined as "deliberate indifference" be denied.

DATED the ___9___ day of August, 2007.

Respectfully Submitted,

By: _____
Niels Pearson

Niels L. Pearson P.C.
3050 Durango Drive
Las Vegas, NV 89117

**CERTIFICATE OF SERVICE**

Pursuant to Civ. R. 5(b), I certify that I am an employee of Niels L. Pearson P.C., and that on ___*Aug 10*___, 2007, I caused a true and correct copy of the foregoing document to be delivered via the United States District Court's CM/ECF System to the following individuals on the Service List:

**SERVICE LIST**

| ATTORNEYS OF RECORD | PARTIES REPRESENTED | METHOD OF SERVICE |
|---|---|---|
| Mark E. Ferrario, Esq.<br>Kummer Kaempfer Bonner & Renshaw<br>3800 Howard Hughes Parkway, 7th floor<br>Las Vegas, NV 89109 | | ☒ CM/ECF service (filed under seal, hand-delivered to Mark Ferrario, Esq.) |

*Catherine Tngman*

An employee of NIELS L. PEARSON P.C.

19